952 A.2d 1034

BETH GODFREY AND JENNIFER BAYNE KILE, PLAINTIFFS–
APPELLANTS, v. PRINCETON THEOLOGICAL SEMINARY,
DEFENDANT–RESPONDENT.

Argued April 7, 2008—Decided August 4, 2008.

180

*John E. MacDonald* argued the cause for appellants (*Stark & Stark*, attorneys; *Amy Beth Dambeck*, of counsel; *Ms. Dambeck* and *Jason A. Storipan*, on the briefs).

*Brian P. Sullivan* argued the cause for respondent (*Stevens & Lee*, attorneys; *Mr. Sullivan, Bradley L. Mitchell* and *Nanette M. Embres*, on the brief).

Justice LaVECCHIA delivered the opinion of the Court.

In *Lehmann v. Toys 'R' Us, Inc.*, 132 *N.J.* 587, 626 *A.*2d 445 (1993), Justice Garibaldi, writing for this Court, delineated the standards of proof that are necessary in order to bring a discrimination claim premised on acts of sexual harassment. To demonstrate a discriminatory hostile environment caused by sexual harassment, a plaintiff must show that "the complained-of conduct (1) would not have occurred but for the employee's gender; and it was (2) severe or pervasive enough to make a (3) reasonable woman believe that (4) the conditions of employment are altered and the working environment is hostile or abusive." *Id.* at 603–04,

626 A.2d 445 (emphasis omitted). The question before us in this appeal concerns whether the severe-or-pervasive-conduct prong of that standard was met.

In this matter, two women enrolled at the Princeton Theological Seminary (the Seminary) claimed that they were harassed by an elderly tenant of Seminary housing. They filed sexual harassment claims against the Seminary under the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5–1 to –49. A majority of the Appellate Division below affirmed the trial court's grant of the Seminary's motion for an involuntary dismissal of plaintiffs' claims at the close of plaintiffs' cases-in-chief.[1] *See R.* 4:37–2(b). The majority held that no reasonable factfinder could conclude that plaintiffs had been subjected to harassing conduct that was "severe or pervasive." The case comes to us on an appeal as of right because of a dissent in the Appellate Division, *R.* 2:2–1(a). We agree with the analysis of the Appellate Division majority, and, therefore, we affirm the judgment below.[2]

---

[1] Plaintiffs' Complaint also included claims for negligence, breach of contract, and violations of Title IX. The involuntary dismissal of those claims was affirmed unanimously on appeal. Those determinations are not before us. Our review is limited to the propriety of the trial court's involuntary dismissal of plaintiffs' LAD claims.

[2] During oral argument, a question was raised about the LAD's applicability to the Seminary. Plaintiffs' claims were brought pursuant to Sections 4 and 12(d) of the LAD, N.J.S.A. 10:5–4 and –12(d), which apply only against a "place of public accommodation," a statutorily defined term that specifically excludes religious or sectarian educational institutions. *See N.J.S.A.* 10:5–5(*l*) (defining "[a] place of public accommodation" as excluding "any educational facility operated or maintained by a bona fide religious or sectarian institution"). Although this Court has not addressed the issue squarely, our Appellate Division has determined that "the exemption in *N.J.S.A.* 10:5–5(*l*) of the LAD [for educational facilities operated or maintained by bona fide religious or sectarian institutions] cannot be waived." *Romeo v. Seton Hall Univ.*, 378 *N.J.Super.* 384, 391, 875 A.2d 1043 (App.Div.), *certif. denied*, 185 *N.J.* 295, 884 A.2d 1265 (2005); *see also Recent Developments in the Law: Universities and Other Institutions of Higher Learning*, 35 *J.L. & Educ.* 111, 113 (2006) (stating that "[t]he LAD's exemption of such [religiously affiliated] educational facilities from the prohibi-

## I.

Plaintiffs' LAD claims arise out of the Seminary's handling of their allegations of sexual harassment by William Miller, a 1964 alumnus of, and contributor to, the Seminary. Miller was seventy years old when plaintiffs filed their 2003 Complaint. At all times relevant to this litigation, Miller resided at the Charlotte Rachel Wilson (CRW) apartments, which, while not located on the Seminary's main campus, are located in close proximity to it and are considered on-campus housing. That residence allowed Miller to attend frequently public events held at the Seminary, and Miller otherwise often could be found about the Seminary's campus.

We now turn to the evidence that plaintiffs presented in support of their respective claims. In doing so, we present the facts at length in a light most favorable to plaintiffs, *Monaco v. Hartz Mountain Corp.*, 178 *N.J.* 401, 413, 840 *A.*2d 822 (2004), and review them, and the reasonable inferences to be drawn therefrom, to determine whether the evidence that plaintiffs presented could reasonably support a judgment in their favor, *Barsotti v. Merced*, 346 *N.J.Super.* 504, 512–13, 788 *A.*2d 802 (App.Div.2002). *See also Zive v. Stanley Roberts, Inc.*, 182 *N.J.* 436, 441–42, 867 *A.*2d·1133 (2005).

---

tion against discrimination ... cannot be waived") (citing *Romeo, supra,* 378 *N.J.Super.* at 391, 875 *A.*2d 1043).

Ordinarily before assessing the quantum of proofs sufficient to support or defeat a claim, our threshold inquiry is whether a cause of action properly lies. Yet, concentrating exclusively on the sufficiency of plaintiffs' case, the parties have assumed, without explanation, that the LAD applied. Because the procedural posture of this appeal as of right on the dissent below requires that we focus on the Appellate Division's difference of opinion over whether plaintiffs stated a case, *see Gilborges v. Wallace,* 78 *N.J.* 342, 349, 396 *A.*2d 338 (1978), we shall address that limited issue. In light of our ultimate conclusion in this case, practical reasons also compel us to forebear from engaging in a closer examination of the LAD's applicability at this time. That said, we caution that, although we reach and address the sufficiency of plaintiffs' case, nothing in our opinion should be deemed to suggest either that the LAD applies to religious institutions notwithstanding the exclusionary language of *N.J.S.A.* 10:5–5(*l*), or that the LAD's statutory prerequisite—that the defendant be a "place of public accommodation"—can be waived.

## A. Godfrey's claims

Beth Godfrey enrolled at the Seminary in 2000 to pursue a Masters of Divinity degree. She was attracted by the Seminary's "small community atmosphere," and described the Seminary as "a very small place" where student housing, the President's office, administrative offices, and the dining hall are all in close proximity. During her time at the Seminary, Godfrey resided in on-campus student housing and held part-time positions as a photographer and, later, as an assistant in the Seminary's financial aid and admissions offices. She served on the Board of Students during her first year of enrollment, and she also actively participated in Friday Night Fellowship (FNF) gatherings—weekly student-run worship services that often included guest speakers. Many of the functions that Godfrey attended occurred at the Mackay Campus Center (Campus Center), which housed the Seminary's main dining facility and was the locus of many of the Seminary's public and private events.

It was at the Campus Center that Godfrey first came into contact with Miller. In the fall of 2000, Godfrey, who was then twenty-five years old, entered the Campus Center cafeteria to eat dinner. At a nearby table, Godfrey noticed a friend conversing with a person whom Godfrey believed to be a retired professor or someone affiliated with the Seminary community. That individual, to whom Godfrey was introduced after she joined the table, was Miller.

Godfrey next saw Miller at the first FNF gathering that followed their introduction at the Campus Center. Although Godfrey could not recall whether Miller had attended prior FNF gatherings, she found his presence peculiar because, aside from the guest speakers, only Seminary students generally attended FNF gatherings. Miller participated in the worship service and in discussion groups that formed after the gathering concluded. Godfrey saw Miller at three or four subsequent FNF gatherings.

In December 2000, Godfrey had direct contact with Miller at an annual, formal Christmas dinner at the Campus Center. The

dinner, which is followed by caroling and dancing, is a Seminary community event usually attended by students, their families, administrators, and faculty. During the dinner-portion of the evening, Godfrey excused herself from a table of her friends and proceeded to a line that had formed at the dessert bar. Miller approached Godfrey from behind, placed his hand on her shoulder, and said "Beth." Godfrey turned, expecting to see one of her friends, but instead saw Miller. Godfrey said, "Hello," and Miller then clasped Godfrey's hand in both of his hands and said, "It's so good to see you here this evening." Godfrey retracted her hand, at which time Miller invited Godfrey to accompany him to a "concert across town" later that evening. Godfrey refused, and turned to proceed in line toward the dessert bar. Miller followed, and continued, "[O]h come on. It's going to be a beautiful concert. You know, I have these tickets. It's going to be a lovely evening and I'd like to share it ... with you." Godfrey again refused, telling Miller that she planned to go with her friends to the caroling and the dance. Godfrey took a dessert from the dessert bar and returned to her friends where she reported her interaction with Miller.

Later that evening, Godfrey saw Miller at the caroling, which occurred in a separate room in the Campus Center after the dinner. Godfrey was stationed across the room from Miller, but Miller proceeded to "walk[ ] within ... [a few] feet of [her]." In an effort to avoid Miller, Godfrey "walked all the way around the room ... to the other side [so that Miller] wouldn't follow [her]." No further interaction occurred between Godfrey and Miller that evening.

The following week, Godfrey was with a friend at a Hallmark store in a local mall when Godfrey saw Miller. Godfrey attempted to avoid Miller's detection by moving to the other side of the store, but when her friend beckoned Godfrey to view an item in the store, Miller was alerted to Godfrey's presence. Miller approached and said, "Good evening, Beth." Godfrey said, "Hello," and moved toward her friend, who then introduced herself to

Miller. Godfrey's friend completed her purchase shortly thereafter, and Godfrey and her friend left the store.

Godfrey did not have any further contact with Miller until she returned to the Seminary in January after the two-week Christmas break. In her accumulated mail, Godfrey received a package from Miller that, peculiarly, was addressed to Godfrey's dormitory room rather than to her campus mailbox.[3] Godfrey had not told Miller where she lived, and she presumed that an individual at the campus post office recognized Godfrey's name and placed the package with her mail. Inside the package was a card that read, "Dear Beth," and went on to provide a lengthy account of Miller's personal life and information about his holiday plans. The parcel also contained a package of Winnie the Pooh note cards. Although disturbed by Miller's behavior, Godfrey sent a concise, polite note stating, "Thank you for the card and the note cards.... May you sense God's peace in Jesus Christ this Christmas." Godfrey then discarded the contents of Miller's package. Thereafter, Godfrey stopped attending FNF gatherings and took other steps to avoid areas where she expected that Miller might be present.

Godfrey did not have further direct interaction with Miller until the summer of 2001. At that time, Godfrey resided at the CRW apartments in a building across the street from that which housed Miller. While standing in a line of students in the Campus Center cafeteria, Miller approached Godfrey from behind and tapped her. When Godfrey turned, Miller said, "Hello, Beth." Godfrey said, "Hello," and turned away. Miller then invited Godfrey to have lunch with him. When Godfrey refused, Miller responded by asking, "[H]ow about I take you out some other day?" Godfrey again refused, stating, "I would only eat with you if we were in the

---

[3] The Seminary published a student directory, a copy of which was placed in the Seminary's library, which was open to the public. Miller could have obtained Godfrey's address via that directory.

middle of this cafeteria at a group table with other people." Godfrey then took her lunch and departed.

The following Saturday, Godfrey returned to her apartment from a camping trip with fellow students. Among the telephone messages that Godfrey received from family and friends was a message from Miller. In that message, Miller stated that he was "delighted to see [Godfrey] in the cafeteria and meet up with [her] again." Miller proceeded to invite Godfrey to a concert that evening. Godfrey did not return the call.

Later that day, Miller again phoned Godfrey. He said, in a tone that was more anxious than in his prior call, that he had hoped that Godfrey would call him back. After remarking that he assumed that Godfrey could not attend the concert, Miller invited Godfrey "to go to his church service [the following day] and then ... out to lunch." Godfrey again ignored the call. She returned to her apartment later that evening and discovered that Miller had left another telephone message asking her to "meet up with [him] to go to church, [and then to go on] a date out to lunch." As with the other messages, she did not respond.

The following day, Godfrey left her apartment to attend church, after which she planned to return to her apartment before leaving for New Hope, Pennsylvania, the location of her field internship. After Godfrey had departed, Miller telephoned and left a message on Godfrey's answering machine. Godfrey recalled that, in that message, Miller stated in a more "insistent and persistent" tone,

[Y]ou haven't called me back. And I wanted to go out with you. I wanted to go [to] church with you and well, now, it's too late to go to church. I guess you've probably already gone to your church or something. So, it's too late to go to church.

So, I'd like to invite you to go out with me this afternoon to a picnic. I have a great picnic basket. I have, you know, a blanket. It's a concert. We can go. I'll bring some drinks and I'll bring some snacks. And we can go to this picnic and sit together and talk and have companionship.

When Godfrey did not respond, Miller telephoned later that afternoon and left a "very threatening, very harassing" message in which "he was very much more inflamed and angry" that Godfrey

had not returned his calls. Miller said, "[Y]ou didn't call me back.... [G]ood Christian women ... call men back when they ask them out." Nevertheless, Miller remained persistent. He said, "It's not too late. You just pick up my invitation to go to the picnic with me. We have an hour or so before it's too late. And call me back." Godfrey did not respond.

Godfrey resolved to approach Seminary administrators in hopes of securing measures that would shield her from Miller's advances. She proceeded to the administration building to schedule a meeting with the Dean of Students, Jeffrey O'Grady. Godfrey learned that O'Grady was on an extended summer vacation, and when Godfrey pressed her need to speak with someone immediately, she was referred to Kathy Cook Davis, the Student Relations Director. Godfrey was able to meet with Cook Davis that day, and proceeded to inform her about Miller's behavior. Cook Davis was sympathetic, even sharing that Miller had pursued her when she was a student at the Seminary. Cook Davis also informed Godfrey that O'Grady had handled past complaints about Miller, and, therefore, she asked whether Godfrey would wait to pursue her complaint for a couple of weeks, after O'Grady returned. Cook Davis explained that O'Grady was the person best suited to handle the situation. Godfrey acceded, but stated that she would return if any further incidents between her and Miller occurred in the interim.

## B. Kile's claims

In 1999, Jennifer Kile enrolled in a three-year program at the Seminary to pursue a Masters in Divinity degree. During her years at the Seminary, Kile also worked at the Seminary's library and participated in social activities, including FNF gatherings, which she attended "[a] couple of times a month."

Kile first encountered Miller in the fall of 1999, when he approached her in the library and requested phone numbers for "two young women on campus [whom] he wanted to take ... out for dinner." Kile refused the request, finding it odd that Miller

purported to know the women but did not have their phone numbers. Miller then departed.

In the days following their initial encounter, Miller, on two separate occasions, approached Kile while she was working in the library. During both instances, Miller's purpose was to show her articles regarding various ministries. Kile responded by "chatt[ing] with him very politely as an employee to a patron for a few minutes."

In January 2000, after Kile returned from Denver where she had spent her Christmas break, Kile received a package in the mail from Miller. Inside, Kile found a greeting card, which had Miller's picture on it. The package also contained a newsletter, on which Miller had written "Dear Jennifer," that provided information about Miller's company, a copy of a letter from the Seminary thanking Miller for his contributions to the Seminary, a devotional book, and a scripture card. Kile discussed the package with her boyfriend—Kile's husband by the time of trial. Kile also informally discussed Miller's behavior with O'Grady after Kile found herself alone with O'Grady at a table in the Campus Center cafeteria. After that discussion, O'Grady did not take action against Miller, and Kile did not pursue the matter further at that time.

In September 2000, Kile took advantage of an opportunity to study abroad at the University of Shetfield in Shetfield, England. She returned to the Seminary for a week in the spring of 2001. During that week, Kile was in the Campus Center cafeteria when she heard someone call out her name. Kile turned to see Miller seated at a nearby table with a gentleman whom Miller introduced as an important contributor to the Seminary. Miller then said to Kile, "I know that you are in England. Why don't you give me your street address? We can get together." Kile was "freaked out" by Miller's request as well as by his knowledge of her whereabouts. Kile declined to provide her street address, and, in an attempt "to get out of [the situation] politely," she said that her address in England would be changing. Miller then requested

Kile's e-mail address. In an effort to quickly and politely depart, Kile provided Miller with her Yahoo! e-mail address. She did not divulge the e-mail address issued to her by the Seminary. Kile then invented an excuse to leave the cafeteria, stating that she had to attend chapel service.

Kile proceeded to the Seminary's chapel where she was to assist her then-fiancé, who was the "main speaker liturgist" at that morning's service. When the service concluded, Kile departed the chapel. As Kile made her way past the Seminary's administration building, Miller approached her. He told her that he had attended the chapel service because she had told him that she would be there. Finding Miller's admitted behavior bizarre, Kile quickly fled.

At the end of her week at the Seminary, Kile returned to England. A couple of weeks later, Miller sent Kile an e-mail to inform her that he would be coming to England and that he wanted to invite her to meet him in London, which is approximately five hours from Shetfield by train, to attend a lecture and go out to dinner. Kile did not respond to Miller's e-mail, and the two had no further interaction while Kile was abroad.

In May 2001, Kile returned to the Seminary, having completed her course of study at the University of Shetfield. Like Godfrey, Kile spent that summer residing in the CRW apartments. Because of the Seminary's small campus community, Kile became aware that Godfrey was to meet with O'Grady to discuss Miller's behavior.[4] Kile e-mailed O'Grady on September 4, 2001, which was shortly after Godfrey actually had met with him, and requested that he take action to stem Miller's advances. Kile attached a document detailing her past interactions with Miller.

---

[4] Godfrey had learned of Kile's interactions with Miller prior to Kile's return to England. During the week that Kile had spent at the Seminary that spring, she stayed in a dormitory on the same floor on which Godfrey lived. The two happened to meet in the dormitory bathroom, where the topic of Miller's advances toward Kile arose. It is unclear whether Kile was informed of Godfrey's interactions with Miller at that time.

## C. The Seminary's Response

The remainder of plaintiffs' proofs concerned their interactions with Seminary officials seeking to have the Seminary take satisfactory steps to prevent further contact from Miller. Although these proofs do not go to the harassment by Miller that plaintiffs claim gave rise to sexual harassment amounting to a hostile "work" environment, we recite them to present the entire picture painstakingly developed by plaintiffs.

Godfrey met with O'Grady in August 2001, at which time she informed him about her prior interactions with Miller and expressed concern about Miller's presence in the Campus Center, where many of her interactions with Miller had occurred. O'Grady indicated that, in the past, he had had to take action about Miller's behavior toward female students. A few days later, O'Grady produced for Godfrey a copy of a letter dated September 4, 2001, which was addressed to Miller. The letter noted Miller's "unwelcome contact with a number of ... female students" and prohibited Miller from entering the Campus Center for any reason other than to attend events open to the public. Godfrey approved of the letter.

Later, during the fall of 2002, both Godfrey and Kile sought a response from O'Grady after they informed him that, on at least two occasions, Miller had violated the Seminary's restrictions.[5] Seeking another avenue of relief from Miller's advances, Godfrey and Kile met with Dr. Thema Bryant Davis, a psychology counselor specializing in harassment issues employed by the Seminary and designated in the Seminary's sexual harassment policy as an individual to whom students may bring sexual harassment complaints. Thereafter, on November 6, 2002, Godfrey and Kile again met with O'Grady. At that meeting, O'Grady produced a copy of

---

[5] Kile had seen Miller dining in the Campus Center, and, days later, noticed a flyer in the Campus Center, presumably posted by Miller, indicating that Miller was seeking to hire a receptionist. Godfrey also saw the flyer, and, subsequently, saw Miller at the Seminary's Halloween dinner that was held in the Campus Center.

the Seminary's sexual harassment policy as well as the Seminary's student handbook. O'Grady then informed Godfrey and Kile that their prior complaints were "considered informal," to which Godfrey and Kile responded that they wished to engage in a formal process so that a procedure could be developed that would have actual repercussions should Miller violate the restrictions. After Godfrey and Kile suggested that the Seminary could declare Miller a "persona non grata," and ban him from the campus, O'Grady explained that a male student had become irate when he discovered that he could not invite Miller to eat with him in the Campus Center. O'Grady suggested that Godfrey and Kile consider permitting the Seminary to lift the ban. The meeting then concluded unsatisfactorily for Godfrey and Kile.

The following day, Godfrey and Kile received a letter from O'Grady stating that he was "unable to draw any conclusion because [Godfrey and Kile were] unwilling to provide ... information." O'Grady chastised Godfrey and Kile for not identifying the "designated individual identified in the Sexual Harassment Policy," as well as the "others" with whom they had spoken, to form their conclusion that Miller's conduct amounted to sexual harassment. The "additional information [that Godfrey and Kile] obtained," and which they did not disclose, prevented the Seminary administration from taking "appropriate action" because it was left "uninformed."

The letter further explained that the Seminary's sexual harassment policy had no bearing on Miller's conduct because Miller was a public tenant, and not a member of the Seminary community. O'Grady noted that he was "only aware of Mr. Miller's attendance at the Halloween Dinner and two student group meetings," and that he had sent a second letter to Miller "regarding his violation of the limited access to the [Campus Center] cafeteria." However, because Godfrey and Kile were "convinced that [Miller's conduct was] indeed sexual harassment, and since Mr. Miller is not a member of the Seminary community, the issue should properly be handled by the local police."

After O'Grady's response, Godfrey and Kile approached Katherine Dobbs Sakenfeld, a Seminary professor and another individual designated in the Seminary's sexual harassment policy, to discuss actions that the Seminary might take to curb Miller's conduct. Sakenfeld eventually informed Godfrey and Kile that the Seminary's lawyer had advised her that the sexual harassment policy could not provide an effective means to shield Godfrey and Kile from Miller because Miller was a "tenant [of the CRW apartments,]" essentially "a third party vendor." She then suggested that Godfrey and Kile write to the President's Executive Council (the Council) to complain about their experiences with Miller and the administration's response.

Godfrey and Kile proceeded to send individual letters to all Council members requesting "another communal forum to ... pursue [the matter] in a safe and confidential way," and indicating that they hoped to have Miller banned from the Seminary's campus. In response, the head of the Council, President Thomas Gillespie, sent a letter to Godfrey and Kile, stating that the Council could not grant their request for a formal audience because the Council was an "administrative body ... neither constituted nor authorized" to handle Godfrey and Kile's complaints. Gillespie informed Godfrey and Kile that any further complaint would have to be made to O'Grady, and that they might wish to seek legal counsel because they had become "potentially ... vulnerable to a lawsuit for libel" by making a complaint about Miller with the Council.

Although O'Grady followed up with an e-mail to Godfrey and Kile to set a meeting with them, the Seminary's lawyers, and other administrators, Godfrey and Kile instead consulted with legal counsel.

II.

On April 15, 2003, Godfrey and Kile filed a Complaint in the Law Division asserting a right to recover against the Seminary for

violations of Title IX and LAD.[6] The matter proceeded to trial, Godfrey and Kile testified to the facts described,[7] and, at the close of plaintiffs' evidence, the Seminary moved for involuntary dismissal. *See R.* 4:37–2(b).

In respect of plaintiffs' LAD claims, the trial court noted that plaintiffs could maintain a cause of action for a hostile environment due to sexual harassment only by satisfying the four-part test announced in *Lehmann v. Toys 'R' Us,* 132 *N.J.* 587, 626 *A.*2d 445 (1993). Applying that test, the court held that plaintiffs failed to demonstrate sexual harassment, stating that "none of [the] incidents or communications by Mr. Miller involved any sexual language, any references to sex or any inappropriate sexual comments or suggestions." At no point did Miller's actions amount to more than "annoying and bothersome conduct" to which people often are exposed. A plaintiff must show more "for a jury to find sexual harassment."

The court further stated that, even if plaintiffs could demonstrate sexual harassment, they had failed to show that the Seminary administration had acted with "deliberate indifference to known acts of harassment in its programs or activities."[8] The court therefore dismissed plaintiffs' LAD claims as well as their claims for Title IX violations, negligence, and breach of contract.

Plaintiffs appealed, and a three-judge panel of the Appellate Division unanimously affirmed the dismissal of all but one of plaintiffs' claims. The panel split over whether the trial court properly dismissed plaintiffs' LAD claims. The majority, applying

---

[6] The Complaint later was amended to include claims for negligence and breach of contract.

[7] O'Grady, Gillespie, and other Seminary administrators also testified as part of plaintiffs' case.

[8] In that regard, the court commented that the Seminary's sexual harassment policy did not empower the administration to ban Miller from the campus because Miller was a tenant protected by New Jersey's Anti–Eviction Act, *N.J.S.A.* 2A:18–61.1 to –61.21.

*Lehmann,* conceded that "the jury could reasonably have determined ... that Miller's contact with Kile and Godfrey occurred only because of their gender" because Miller did not engage in similar pursuits of male students. However, the majority concurred with the trial court that, viewing the incidents of Miller's conduct "individually and collectively," plaintiffs failed to produce sufficient evidence to satisfy *Lehmann's* severe-or-pervasive-conduct element.

In a lengthy dissent, Judge Winkelstein explained why he found that plaintiffs presented sufficient evidence to state a prima facie cause of action for hostile work environment due to sexual harassment.

> [R]easonable minds could differ as to whether a reasonable woman would find that Miller's conduct over the years, when considered in its totality, was severe or pervasive enough to create a hostile and offensive educational environment. A jury could find that the successive episodes experienced by each plaintiff, along with the knowledge that Miller had been committing the same conduct against others, had a cumulative effect.... A jury could also conclude that given Dean O'Grady's letter to plaintiffs accusing them of not being forthright with him, and Dr. Gillespie's letter to plaintiffs, essentially threatening them with a libel lawsuit, the Seminary administration joined with Miller in making the educational environment hostile.

Therefore, Judge Winkelstein concluded that plaintiffs' LAD claims should have survived the Seminary's motion for involuntary dismissal.

The panel's decision in respect of the trial court's involuntary dismissal of plaintiffs' LAD claims was appealed to this Court as a matter of right. *See R.* 2:2–1(a).

## III.

New Jersey's Law Against Discrimination (LAD), *N.J.S.A.* 10:5–1 to –49, and its protections for "aggrieved employees," is the mechanism by which "the public's strong interest in a discrimination-free workplace" is enforced. *Lehmann, supra,* 132 *N.J.* at 600, 626 *A.*2d 445. Among the prohibited forms of discrimination is harassment based on sex that causes a work environment to become hostile. *See id.* at 601, 626 *A.*2d 445; *see also N.J.S.A.* 10:5–12(a). Given that the LAD also protects against discrimina-

tion in other settings, *see N.J.S.A.* 10:5-4 (declaring that "[a]ll persons shall have the opportunity ... to obtain all the accommodations, advantages ... and privileges of any place of public accommodation ... without discrimination because of [one's sex]"); *see also N.J.S.A.* 10:5-12(f)(1) (making unlawful denial, refusal, or withholding of "the accommodations, advantages, facilities or privileges [of public accommodations] or to discriminate against any person in the furnishing thereof [on the basis of gender]"), this Court also has recognized that the LAD's promise of protection from discriminatory sexual harassment extends beyond the workplace to other settings. *See L.W. v. Toms River Reg'l Schs. Bd. of Educ.,* 189 *N.J.* 381, 402, 915 *A.*2d 535 (2007) (applying prohibition against sexual harassment to public school setting).

In the non-workplace setting of the present case, the standard for demonstrating a prima facie claim of discrimination based on acts of sexual harassment remains as was expressed originally in *Lehmann.* A plaintiff asserting a LAD hostile work environment claim premised on sexual harassment must show that the conduct "was ... severe or pervasive enough to make a ... reasonable woman believe that ... the conditions of employment are altered and the working environment is hostile or abusive." *Lehmann, supra,* 132 *N.J.* at 603-04, 626 *A.*2d 445 (emphasis omitted). Whether conduct is "severe or pervasive" requires an assessment of the totality of the relevant circumstances, *see Taylor v. Metzger,* 152 *N.J.* 490, 506, 706 *A.*2d 685 (1998), which involves examination of (1) "the frequency of all the discriminatory conduct"; (2) "its severity"; (3) "whether it is physically threatening or humiliating, or a mere offensive utterance"; and (4) "whether it unreasonably interferes with an employee's work performance." *Green v. Jersey City Bd. of Educ.,* 177 *N.J.* 434, 447, 828 *A.*2d 883 (2003) (internal quotation marks omitted).

When evaluating the severity or pervasiveness of the harassing conduct, "the *cumulative effect* of the various incidents" must be considered. *Lehmann, supra,* 132 *N.J.* at 607, 626 *A.*2d 445 (emphasis added). It is insufficient to assess incidents individ-

ually as if each were hermetically sealed from the others. *See ibid.* In most cases, it is the cumulative impact of successive incidents from which springs a fully formed hostile work environment. *See ibid.* Furthermore, when determining whether conduct has created a hostile work environment, the harassing conduct itself must be evaluated, "not its effect on the plaintiff." *Id.* at 606, 626 *A.2d* 445. Whether harassing conduct makes a work environment hostile is assessed by use of a reasonable-person standard,[9] which was adopted to keep the test for harassing conduct tied to reasonable community standards and yet allow for its evolution as societal norms mature. *Id.* at 603–04, 612, 626 *A.2d* 445.

## IV.

■ A motion for involuntary dismissal only should be granted where no rational juror could conclude that the plaintiff marshaled sufficient evidence to satisfy each prima facie element of a cause of action. *See Pitts v. Newark Bd. of Educ.,* 337 *N.J.Super.* 331, 340, 766 *A.*2d 1206 (App.Div.2001); *see also Cameco, Inc. v. Gedicke,* 299 *N.J.Super.* 203, 212, 690 *A.2d* 1051 (App.Div.1997), *aff'd as modified,* 157 *N.J.* 504, 724 *A.2d* 783 (1999). It is from that perspective that we assess whether plaintiffs met the severe-or-pervasive-conduct requirement.

## A.

Objectively viewed, ·Godfrey's encounters with Miller occurred over a period of years and involved sitting with him during lunch at a school cafeteria table with others, seeing him at three Friday Night Fellowship gatherings, receiving a couple of social invita-

---

[9] In *Lehmann, supra,* we held that in the sexual harassment context, the reasonable person standard is gender-specific. 132 *N.J.* at 611–12, 626 *A.2d* 445. Thus, we directed courts to consider sexual harassment claims brought by a woman "from the perspective of a reasonable woman." *Ibid.* Likewise, "[i]f the plaintiff is male, the perspective used shall be that of a reasonable man." *Ibid.*

tions as well as a Christmas parcel containing a Christmas card and Winnie the Pooh note cards, and finding five messages on her telephone answering machine in which Miller became more urgent and persistent in his pursuit of a date with her. She also ran into him in a local Hallmark store.

Kile's interactions over a similarly lengthy period of time involved three innocuous encounters in the library, receipt of a package containing religious articles, including a devotional book and scripture card, · and a Christmas card and newsletter, the cafeteria/chapel incident, and the e-mail that she received while in England, to which she did not respond.

■ The events are intentionally described in sterile terms, stripped of the overlay of Godfrey's and Kile's subjective reactions to these interactions, which comprised most of their testimony. Indeed, Kile described herself as "on the lookout for him," "on guard," "freaked out" by Miller's decision to attend the chapel service because Kile had said that she would be there, and "stalked." Godfrey also was disturbed by her feeling that Miller was "monitoring . . . [her] comings and goings," and she described herself as "distress[ed]" by his presence. However, plaintiffs' subjective responses to the allegedly harassing conduct do not control, or otherwise affect, the determination of whether the conduct is severe or pervasive, which requires application of the reasonable-woman standard. Viewed from that perspective, we have no doubt that the trial court and the appellate majority correctly regarded the totality of that evidence as falling short of severe or pervasive conduct that a reasonable woman would determine to constitute sexual harassment. *Compare Lehmann, supra,* 132 *N.J.* at 595–97, 627, 626 *A.*2d 445 (remanding for further findings of fact and determination of whether newly announced hostile work environment test was satisfied where plaintiff's supervisor advised plaintiff to use her sexuality to persuade new boss, lifted up plaintiff's shirt to expose her bra strap, grabbed other female employees in plaintiff's presence, and made sexually offensive remarks); *see also Newsome v. Admin.*

*Office of the Courts of N.J.,* 103 *F.Supp.*2d 807, 811–13, 816 (D.N.J.2000) (finding sufficient evidence of severe or pervasive conduct to state LAD claim where plaintiff's supervisor, on numerous occasions, hugged, grabbed, and touched plaintiff, represented to others that he and plaintiff were dating exclusively, attempted to kiss plaintiff after appearing in local park where plaintiff jogged, and exacerbated harassing environment by routinely making sexually offensive remarks); *cf. Wilson v. Parisi,* 268 *N.J.Super.* 213, 216, 219, 633 *A.*2d 113 (App.Div.1993) (holding that plaintiff provided sufficient evidence to overcome summary judgment where plaintiff alleged that her supervisor "attempt[ed] to persuade her to engage in a sexual relationship with him after she informed him that she had no such interest[,] . . . attempted to kiss [plaintiff], kissed her, fondled her, and attempted to pull her into a [hotel] elevator . . . to take her to a hotel room" for intimate sexual relations).

As the Appellate majority stated,

Miller's repeated and unwelcome behavior was one of the socially uncomfortable situations that many women encounter in the course of their lives when someone in whom they are not interested persists in trying to persuade them otherwise. In our view, Miller's persistence did not cross the line and become actionable harassment.

Whether we view the encounters that Godfrey and Kile had with Miller individually, or cumulatively, we arrive at the same conclusion. Although socially inapt and, no doubt, annoying, Miller's conduct did not approach sexual harassment. Persons who are socially tone deaf are not, by that characteristic, necessarily the equivalent of sexual harassers. It is important in that regard that neither of these women used her own authority to tell Miller to "go away." They cannot rely on the prospect of a money damages award from the Seminary to replace their own obligation to simply tell Miller that they had no interest in him romantically or even as a casual acquaintance. To allow the LAD to replace such basic human interaction trivializes the purpose for which the LAD was established.

## B.

In addition to citing their own encounters with Miller, plaintiffs sought to bolster their claim that Miller's conduct rose to the level of "severe or pervasive" by citing Cook Davis's statements to Godfrey that (1) she was pursued by Miller when she was a student at the Seminary; and (2) past female students also had been pursued by Miller. According to plaintiffs, that increased their fear of Miller, whom they now knew had engaged in similar behavior for many years.

Plaintiffs' reliance on Cook Davis's experiences with Miller twenty years previous is misplaced. Those encounters do not contribute additional weight to plaintiffs' claims. Similarly, plaintiffs can garner no support from their attempt to rely on the experiences of unnamed other females who did not come forward as part of plaintiffs' case.

Plaintiffs further contend that the statements about Miller's earlier interest in other female students exacerbated the severe or pervasive nature of Miller's conduct because those statements evidenced the Seminary's awareness of Miller's past acts and its failure to take effective action to curb his advances toward female students. That argument is of no avail for the same reasons that plaintiffs cannot rely on the Seminary's response to plaintiffs' complaints about Miller in order to demonstrate sexually harassing conduct that satisfies *Lehmann's* severe-or-pervasive standard.

The means employed by an institution to deter harassment, and the enforcement of those means, may be considered when assessing that institution's vicarious liability for the actions of an individual over whom the institution exercises control. Thus, *Gaines v. Bellino,* 173 *N.J.* 301, 801 *A.*2d 322 (2002), held that employers who have "exercised due care in acting to prevent a sexually discriminatory hostile work environment" will be shielded from vicarious liability for discriminatory conduct in the workplace. *Id.* at 303, 801 *A.*2d 322. Whether the "employer contrib-

uted to the harm [caused by its agent] through its negligence" *Lehmann, supra,* 132 *N.J.* at 624, 626 *A.*2d 445, and will therefore suffer vicarious liability, necessitates an examination of the preventative measures put in place to deter harassing conduct. *See Gaines, supra,* 173 *N.J.* at 313, 801 *A.*2d 322. In addition to considering whether an employer's preventative measures exist and have been enforced, we also have found to be relevant evidence that addressed the adequacy of an institution's response to prior reported incidents of sexual harassment. Such evidence is helpful to determine whether an institution may be permitted to disclaim vicarious liability on grounds of having exercised "due care." *See ibid.* An institution's past experiences, which highlight flaws in the preventative measures employed, and a failure to adjust adequately to improve deterrence based on that experience, can provide relevant and weighty evidence in a due-care analysis. *Ibid.* Moreover, such evidence would be relevant whether or not a plaintiff had firsthand knowledge of the prior acts of harassment known to the institution. *See ibid.*

All that said, however, the admissibility rationale applicable to the vicarious-liability element of a LAD claim against an institution never was intended to seep into the severe-or-pervasive calculus. To satisfy the severe-or-pervasive element of a hostile work environment claim, a plaintiff must marshal evidence of bad conduct of which she has firsthand knowledge. *See Lehmann, supra,* 132 *N.J.* at 610–11, 626 *A.*2d 445; *see also Fitzgerald v. Stanley Roberts, Inc.,* 186 *N.J.* 286, 319, 895 *A.*2d 405 (2006) (holding that gossip evidence about alleged other acts of harassment was inadmissible to demonstrate hostile environment, but acknowledging alternative uses of evidence, for example to address effectiveness of employer's sexual harassment policy or credibility of witnesses denying that harassment occurred). Thus, in addition to evidence of harassing conduct directed at the plaintiff, a plaintiff may also attempt to demonstrate the existence of a severe or pervasive hostile environment by presenting evidence of harassment by the perpetrator that was directed at

others and that the plaintiff witnessed.[10] *See Lehmann, supra,* 132 *N.J.* at 611, 626 *A.*2d 445 ("A woman's perception that her work environment is hostile to women will obviously be reinforced if she *witnesses* the harassment of other female workers.") (emphasis added); *Baliko v. Stecker,* 275 *N.J.Super.* 182, 190, 645 *A.*2d 1218 (App.Div.1994) (same); *see also Grazioli v. Genuine Parts Co.,* 409 *F.Supp.*2d 569, 573, 577–78 (D.N.J.2005) (weighing, when determining pervasiveness, evidence that plaintiff witnessed her supervisor "constantly degrad[e female employees] by simulating [fellatio] behind the backs of women who knelt down to retrieve items from [his] filing cabinet" and routinely comment on female employees' breasts and genitalia) (internal quotation marks omitted); *Hargrave v. County of Atl.,* 262 *F.Supp.*2d 393, 415–16 (D.N.J.2003) (evaluating, in pervasiveness assessment, evidence that plaintiff witnessed her supervisor make "several sexually offensive remarks and jokes to [plaintiff] and several of her female co-workers").

 In this case, Cook Davis's statements about Miller's earlier conduct that was neither directed at plaintiffs, nor witnessed by them because it occurred before their attendance at the Seminary, did not bolster plaintiffs' claims of a severe or pervasive hostile environment. In sum, plaintiffs' case fell short of the proofs necessary to state a hostile work environment claim based on sexual harassment because the severe-or-pervasive prong of the *Lehmann* test was not satisfied. Therefore, we hold that the trial court's determination to grant the Seminary's motion for involun-

---

[10] Our finding that the evidence about the Seminary's response does not bolster plaintiff's case in respect of the severe-or-pervasive prong of *Lehmann* should not be perceived as an approval of the Seminary's actions. These two female students importuned their school for relief from behavior that they believed to be sexually harassing, following the sexual harassment policy's procedures by approaching individuals expressly charged with handling such issues. The Seminary's response to the distress of its students—ultimately warning them that they risked engaging in libelous action by complaining to Seminary authorities about Miller—was disappointing at best.

tary dismissal properly was affirmed by the Appellate Division majority below.

## V.

For the reasons set forth in this opinion, the judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO and HOENS—7.

*Opposed*—None.