**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-3075
_____

BARBARA CHURCH,
                              Appellant

v.

SEARS HOLDING CORPORATION, d/b/a Sears Store #2374;
SEARS ROEBUCK AND CO.; XYZ BUSINESS ENTITIES 1-10;
JOHN DOES 1-20, all fictitious names and/or entities who
should be identified through discovery
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW JERSEY
(D.C. No. 1-12-cv-04814)
District Judge: Hon. Renee M. Bumb
_____

Submitted Under Third Circuit LAR 34.1(a)
March 5, 2015
_____

Before: SHWARTZ, SCIRICA, and ROTH, Circuit Judges.

(Filed: March 30, 2015)
_____

OPINION[*]
_____

SHWARTZ, Circuit Judge.

_____

[*] This disposition is not an opinion of the full Court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

Barbara Church appeals the District Court's grant of summary judgment in favor of Sears Holding Corporation and Sears Roebuck and Company ("Sears") on her claims under the New Jersey Law Against Discrimination, N.J. Stat. Ann. § 10:5-1, et seq. ("NJLAD").  For the following reasons, we will affirm in part and reverse in part.

I

In July 2007, Church began working as a part-time Merchandise Customer Assistant ("MCA") at a Sears store in Vineland, New Jersey.  Her responsibilities included organizing the sales floor, folding and replenishing merchandise, dusting, cleaning floors, tidying fitting rooms, greeting and helping customers, and pricing items for sale.

In or about August 2008, Church provided Sears with a note from her physician advising that she could not engage in heavy lifting or work late hours due to a 2000 car accident that left her with short-term memory loss,[1] mild speech difficulty, muscle weakness, balance problems, and difficulty performing manual tasks.  In response, Sears did not require Church to perform any heavy lifting and scheduled her shifts from approximately 10:00 a.m. to 2:00 or 3:00 p.m.  Church's hours fluctuated according to Sears' business needs.

From July 2007 through June 2009, Church's supervisor was Noemy Echevarria, an Assistant Store Manager ("ASM") for the Vineland store.  Echevarria testified that Church ably performed the "normal" duties of an MCA, including folding clothes, cleaning fitting rooms, assisting at the register, answering customer's questions, and re-

---

[1] There is no evidence Sears was informed Church had any cognitive issues.

shelving merchandise. In 2010, two new managers arrived: Daniel Fisher became the Store Manager in March, and Anthony Archie replaced Echevarria as ASM in May.

Church claims her employment changed when Archie arrived. She explained that Archie "would make [her] feel uncomfortable" by referencing her disability, at one point saying, "[s]orry we're not all special and can't only work in the mornings." App. 409. Church also testified that Archie repeatedly asked her to perform duties outside her restrictions, such as climbing ladders and working additional hours, and gave her "snippy" responses when she refused to do so.[2] App. 603. Archie denied these claims. He did, however, testify that he attempted to "get the feel of what" each of the approximately thirty MCAs at the Vineland store "was used to and . . . what they were doing," App. 149, given that some MCAs "had better strengths than other[s]." App. 150.

To this end, Archie and Winifred Hatcher, Church's immediate supervisor, met with Church at least twice to determine the tasks that Church could perform.[3] Hatcher testified that during their first meeting, Archie went over Church's job description,[4] and that during the second, Archie gave Church a highlighter and asked her "to highlight the items" in her job description that "she could do." App. 477. Church declined to highlight any items and, with Archie's permission, took the job description home with

---

[2] Church was unable to identify whether anyone overheard these requests or comments.

[3] Winifred Hatcher supervised Church for approximately one year under both Echevarria and Archie. She testified that she never had a problem with Church's work, could not recall anyone else having a problem with her work, and that Church would do "whatever" Hatcher asked of her.

[4] The record includes several versions of the job description, each of which has very general categories of duties. It is unclear which version was used during the discussions with Church.

her.

Soon thereafter, Archie, Fisher and Laurellyn Davis, a Sears Human Resources Lead, reviewed the medical documentation in Church's file. Although Church had previously provided the August 2008 physician's note advising of her "restriction" of no "late hours" or "heavy lifting," App. 141, Archie testified that he found no "medically related" documents in her file, App. 153, and asked Church to provide additional documentation. Church responded with another physician's note, dated September 1, 2010, stating: "[d]ue to [Church's history of] pain [and] Anoxic Encephalopathy[,] she is partly disabled and can only work about 4 hours during morning hours & early afternoon." App. 212. About two months later, Sears asked Church to have her physician complete a Health Care Provider Certification Form ("Certification") to identify any limitations on her ability to work as an MCA. Adrienne Kane, a Sears Human Resources consultant, told Archie he could "keep [Church] off of the work schedule until the [Certification] form is submitted." App. 378. Accordingly, Sears did not schedule Church to work during this time.

Church provided Sears another physician's note and the completed Certification on or about November 17, 2010. The Certification stated that Church suffered a "traumatic brain injury" that "substantially limited" her "talking" and limited her ability to perform "manual tasks," caused "balance problems," and made her unable to climb ladders. App. 449. It also stated that, due to "muscle weakness," she could "only work about 5 hours a day and can only do lifting" not to exceed "20 lbs" for more than 30 minutes an hour. App. 449. As an "[a]ccommodation," the Certification recommended a

4

"modified work schedule" of five hours per day.[5] App. 450.

At Kane's suggestion, Archie, Fisher, and Davis convened a meeting with Church on December 6, 2010 to again review Church's job description and ask her to identify the job duties she could perform. Church arrived at meeting with her husband, whom Church said she needed to "feel safe."[6] App. 675. Church's husband was told that he was not permitted to attend the meeting and Church and her husband left.

After the aborted meeting, Kane advised Archie, Fisher, and Davis to call Church and review her job description with her over the phone. According to Church, Archie and Fisher called her on her cell phone while she was out shopping and read to her "an exhaustive job description and instructed her to not interrupt them until they were done." App. 498.[7] Sears then asked her to identify the job duties she could perform. Church did not do so, and claimed that Archie and Fisher refused to allow her to "object[]" until the end of the call. App. 627. In response to her failure to identify the duties, Fisher said: "Barbara, since you cannot tell us what you can do, we have to separate employment." App. 243.

Fisher testified that he, Archie, and Sears' corporate parent decided to terminate Church. Fisher said that "it was an issue where we didn't want her to hurt herself or the company to be at fault for any, like having her perform something. So that was what we did, based off of – what we did, based off of her not being able to tell us what she could

---

[5] The physician's note similarly stated that she could "only work approximately 5 hours per day" and was "unable to do repetitive lifting due to muscle fatigue." App. 451.

[6] Church's husband also testified that he was there to "protect" her. App. 676.

[7] Davis testified that she also participated on the call.

do." App. 659. Davis testified that Church was told during the phone call that she was being terminated "for health reasons, so [that] she could be re-hirable in another position[] if she wanted to come back." App. 203. An internal Sears personnel document (the "Termination Form") described Church's termination as a "Voluntary Separation" for "Health Reasons." App. 214.

As a result of these events, Church brought this action under the NJLAD for disability discrimination (Count One), failure to accommodate (Count Two), and hostile work environment (Count Three). Church now appeals the District Court's grant of summary judgment in Sears' favor.

II[8]

A

Church argues that her disability discrimination claim should survive summary judgment[9] under Price Waterhouse v. Hopkins, 490 U.S. 228, 277–79 (1989) (O'Connor,

---

[8] The District Court had jurisdiction under 28 U.S.C. § 1332 and we have jurisdiction under 28 U.S.C. § 1291. We exercise plenary review over the grant or denial of summary judgment. Mylan Inc. v. SmithKline Beecham Corp., 723 F.3d 413, 418 (3d Cir. 2013). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A disputed issue is "genuine" only "if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." Kaucher v. Cnty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006). We view the facts and draw all reasonable inferences in the non-movant's favor. Hugh v. Butler Cnty. Family YMCA, 418 F.3d 265, 266–67 (3d Cir. 2005).

[9] To evaluate NJLAD discrimination claims, the New Jersey Supreme Court has applied Price Waterhouse. It also has adopted a modified version of McDonnell Douglas v. Green, 411 U.S. 792 (1973), that requires a terminated plaintiff to show that the employer "sought similarly qualified individuals for that job." Victor v. State, 4 A.3d 126, 141 (N.J. 2010). There is no evidence of this here and hence it is not surprising that Church primarily relies on the Price Waterhouse framework.

6

J., concurring).[10]   Under Price Waterhouse, if a plaintiff "produces evidence that an employer placed substantial reliance on a proscribed discriminatory factor in making its decision to take the adverse employment action, the burden of persuasion shifts to the employer to prove that even if it had not considered the proscribed factor, the employment action would have occurred."  McDevitt v. Bill Good Builders, Inc., 816 A.2d 164, 168 (N.J. 2003).  The burden shifts to the employer only if the plaintiff presents "direct evidence" of the employer's discriminatory purpose.  Id. (citing Price Waterhouse, 490 U.S. at 276).  Direct evidence is evidence that is "sufficient to allow the jury to find that the decision makers placed a substantial negative reliance on the plaintiff's [disability] in reaching their decision."  Glanzman v. Metro. Mgmt. Corp., 391 F.3d 506, 512 (3d Cir. 2004); Bergen Commercial Bank v. Sisler, 723 A.2d 944, 954 (N.J. 1999) (direct evidence shows "a direct causal connection between that hostility [toward members of a protected class] and the challenged employment decision.").

Here, Church relies primarily on three pieces of evidence: the Termination Form stating that Sears terminated Church for "health reasons," App. 214; Archie's statement to Church, "[s]orry we're not all special and can't only work in the mornings," App. 409; and Fisher's testimony that he terminated Church because "[i]t was an issue where we didn't want her to hurt herself or the company to be at fault for any, like having her to perform something."  App. 659.  Viewing the record in the light most favorable to Church, this evidence is sufficient for a reasonable jury to find that Sears placed

---

[10] Justice O'Connor's concurring opinion represents the holding in Price Waterhouse.  Fakete v. Aetna, Inc., 308 F.3d 335, 337 n.2 (3d Cir. 2002); McDevitt v. Bill Good Builders, Inc., 816 A.2d 164, 168 (N.J. 2003).

7

substantial reliance on her disability when it terminated her.

The content of the Termination Form is "strong enough to permit the factfinder to infer that a discriminatory attitude was more likely than not a motivating factor in [Sears'] decision," Anderson v. Wachovia Mortg. Corp., 621 F.3d 261, 269 (3d Cir. 2010), as it unequivocally states that Church was terminated for "Health Reasons." App. 214. Although both Fisher and Davis stated that the reason for this notation was so she was eligible for rehire, a reasonable juror viewing the record and the approximately thirty-five other termination choices on the form could find it "directly reflects" that Church's disability played a "substantial factor" in Sears' decision. Fakete v. Aetna, Inc., 308 F.3d 335, 339 (3d Cir. 2002).

Moreover, the Termination Form was completed contemporaneously with Church's termination and so a reasonable juror could find it was proximately "connected to the decision being challenged." Anderson, 621 F.3d at 268. The form was dated and the termination became effective shortly after the December 2010 telephone call when Church was told she would be terminated and hence was proximate to the time of the employment decision. See id.

Lastly, a reasonable juror could find the Termination Form "attributable to a decisionmaker connected with the" decision to terminate Church. Armbruster v. Unisys Corp., 32 F.3d 768, 779 (3d Cir. 1994). Indeed, there is no dispute that Davis, who signed the form, and Fisher, the store manager, were both decisionmakers who stated Church was terminated for health reasons.

The Termination Form also sheds light on the intent behind certain of the

8

decisionmakers's statement. Archie allegedly told Church that "we're not all special," App. 409, and Fisher said that Sears terminated Church because "it didn't want her to hurt herself or the company to be at fault," App. 659. Although these statements in isolation could simply be "stray remark[s] that d[o] not directly reflect the decisionmaking process," viewed in the context of the other evidence, "a reasonable jury might disagree," Fakete, 308 F.3d at 339, and could conclude that Sears relied on Church's disability in making its termination decision. Id. at 338. Thus, Church has carried her burden of persuasion.

We next consider whether Sears has shown that it would have terminated Church even if it had not considered her disability. Anderson, 621 F.3d at 269. Viewing the record in a light most favorable to Church, we are unable to say that a reasonable jury would necessarily so find. Among other things, there are disputed facts concerning Church's job performance. Archie essentially claims she did no work, whereas her past supervisors claim she performed to their satisfaction. As a result, summary judgment is unwarranted on this basis and we will reverse the order granting of summary judgment on Count One.

B

The District Court properly granted summary judgment in Sears' favor on Church's failure to accommodate claim. A plaintiff bringing an NJLAD failure to accommodate claim must establish: "(1) he was disabled and his employer knew it; (2) he requested an accommodation or assistance; (3) his employer did not make a good faith effort to assist; and (4) he could have been reasonably accommodated" but for the

9

employer's lack of good faith.  Armstrong v. Burdette Tomlin Mem'l Hosp., 438 F.3d 240, 246 (3d Cir. 2006).[11]

We agree with the District Court that Church failed to show a genuine issue of material fact on this Count.  Church concedes that Sears accommodated her with respect to the specific restrictions outlined in her physicians' notes of August 2008, September 2010, November 2010, and in her Certification—namely, that she work no more than four to five hours per day and perform no heavy or continuous lifting.

Regarding Sears' refusal to allow Church's husband to "help her in the process" by barring him from the December 6, 2010 meeting, Appellant Br. 35, there is no evidence that Church made Sears aware of any need for such an accommodation or advised Sears of any conditions requiring her husband's in-person assistance.  Because Church provided no information suggesting she needed an accommodation at the meeting to assist her in any way associated with her disabling conditions, her desire to have her husband present at the meeting "did not implicate the requirement that [Sears] make an accommodation."  Utley v. Bd. of Review, Dep't of Labor, 946 A.2d 1039, 1050 (N.J. 2008).  We will thus affirm the grant of summary judgment on Count Two.

C

We will also affirm the grant of summary judgment on Church's hostile work environment claim.  The prima facie elements of an NJLAD hostile work environment claim are: "(1) that plaintiff is in a protected class; (2) that plaintiff was subjected to

_____

[11] We review failure to accommodate claims under the NJLAD as we would claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq. See Armstrong, 438 F.3d at 246 n.12.

conduct that would not have occurred but for that protected status; and (3) that it was severe or pervasive enough to alter the conditions of employment." Victor v. State, 4 A.3d 126, 141 (N.J. 2010). Whether conduct is "severe or pervasive" involves "an assessment of the totality of the relevant circumstances," including: "(1) the frequency of all the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance." Godfrey v. Princeton Theological Seminary, 952 A.2d 1034, 1045 (N.J. 2008) (internal quotation marks omitted).

In performing this analysis, we consider "the cumulative effect of the various incidents" and evaluate the "harassing conduct itself . . . , not its effect on the plaintiff." Id. (emphasis and internal quotation marks omitted). "[O]ffhanded comments, and isolated incidents (unless extremely serious) are not sufficient to sustain a hostile work environment claim." Caver v. City of Trenton, 420 F.3d 243, 262 (3d Cir. 2005) (internal quotation marks omitted). Rather, the alleged conduct must be so "extreme [as] to amount to a change in the terms and conditions of employment." Id.

Church alleges that Archie created a hostile work environment by: (1) reducing her hours and removing her from the work schedule;[12] (2) refusing to provide her with "dust masks and gloves for cleaning";[13] (3) asking questions "in a manner in which she

---

[12] Church's reliance on the reduced work hours does not reflect a change in her employment as her hours fluctuated both before and after Archie's arrival based upon Sears' business needs.

[13] There is no evidence showing that her disability required an accommodation involving special equipment.

11

could not respond because of her short-term memory issues";[14] (4) "repeatedly requesting" additional medical documentation;[15] (5) trying to "guilt" her into working later hours[16]; (6) rolling his eyes, shrugging his shoulders, and "mak[ing] sigh noises" when Church asked for assistance; (7) "ask[ing] her to perform job duties knowing they were outside her" restrictions and repeatedly giving "snippy" responses when she refused to perform them; and (8) telling her, "[s]orry we're not all special and can't only work in the mornings." Appellant Br. 40–41.

Summary judgment on this Count was proper. First, as we note in the margin, many of the acts she relies upon either lack evidentiary support or would not create a hostile work environment. Second, the only specific example of hostile conduct to which Church testified—Archie's alleged statement "[s]orry we're not all special and can't only work in the mornings"—may reflect discriminatory animus for purposes of a discrimination claim, but is the kind of "offhanded comment[]" generally insufficient to sustain a hostile work environment claim. Caver, 420 F.3d at 262. Even if considered in combination with Archie's allegedly "snippy" responses, sighs, or rolling eyes, this evidence is insufficient to show the conduct was threatening, humiliating, or interfered with her work. Thus, there is no basis upon which a reasonable jury could find Archie's purported acts amounted to a change in the terms and conditions of employment. Id. We

---

[14] There is no evidence showing Sears was aware of any memory issues or that Church sought an accommodation for them.

[15] The record shows Archie asked for medical documentation twice between May 2010 and November 2010. No reasonable juror would find these requests by a new manager over a seven-month period to constitute a change in employment conditions.

[16] The effect of a comment on Church is insufficient to establish a hostile work environment claim. Godfrey, 952 A.2d at 1045.

12

will therefore affirm the grant of summary judgment on Count Three.

III

For the foregoing reasons, we will reverse the District Court's grant of summary judgment on Count One, affirm the grant of summary judgment on Counts Two and Three, and remand for further proceedings.