**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0059-19

NATHAN JOHNSON,

     Plaintiff-Respondent,

v.

STATE OF NEW JERSEY,

     Defendant-Appellant.

_____

Submitted March 24, 2022 – Decided June 24, 2022

Before Judges Mawla, Mitterhoff and Alvarez.

On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Docket No. L-0416-14.

Lum, Drasco & Positan LLC, attorneys for appellant (Wayne J. Positan, Daniel M. Santarsiero, and Elizabeth Y. Moon, of counsel and on the briefs).

Ionno & Higbee, LLC, attorneys for respondent (Sebastian B. Ionno, on the brief).

PER CURIAM

Defendant State of New Jersey appeals from a jury's award of $984,000 in emotional distress damages, $2,237.36 in economic damages, and $1 for punitive damages. The jury based its award on plaintiff Nathan Johnson's claims of a hostile work environment based on racial discrimination and retaliation in violation of the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49. For the reasons that follow, we affirm the damage award issued on the retaliation cause of action. We vacate the hostile work environment award, concluding the court should have granted defendant relief on that theory of recovery.

Plaintiff is a Black attorney employed by the New Jersey Department of Banking and Insurance (DOBI) since 1998. In 2004, he was assigned to Legislative and Regulatory Affairs (Legs and Regs), and remained there until 2005. In 2005, he was appointed Special Assistant to the Director of Banking. He enjoyed positive performance reviews until 2006, when he was transferred to a position with the Pinelands Development Credit Bank. In 2008, he filed a discrimination suit. While the suit was pending, he was transferred to DOBI's Office of Consumer Finance (OCF).

Plaintiff's immediate supervisor resisted bringing him into the unit, but was ordered to create a position for him. According to plaintiff, during his first

three years in OCF, he had no job description and had to constantly ask Thomas Hunt, the supervisor, for work. Patrick Mullen, Hunt's supervisor, agreed plaintiff initially lacked clear responsibilities or steady work. Mullen also stated plaintiff was the only regulatory officer in OCF, as the rest were in Legs and Regs.

Hunt complained to Mullen that plaintiff did not timely complete his work. But plaintiff claims Hunt ignored his requests for guidance, and at times requested the completion of assignments plaintiff had already finished. Plaintiff believed Hunt set unreasonable deadlines.

Dana Foraker, manager of human resources (HR) and an employee relations officer, worked with Hunt to resolve plaintiff's alleged failure to meet deadlines. Plaintiff received no performance reviews during his four years in OCF. On June 30, 2011, the parties signed a settlement agreement regarding plaintiff's first discrimination lawsuit.

In 2012, Christopher Hughes was DOBI's chief of staff and oversaw Jack Walton, DOBI's assistant commissioner for administration.[1] Hughes knew plaintiff had filed the first discrimination lawsuit. Hunt and Mullen complained to Hughes about plaintiff's alleged lack of timeliness.

---

[1] Also referred to as director of administration.

A-0059-19

In April 2013, Foraker, Walton, and Mullen instructed plaintiff to supervise Traci Williams, a Black DOBI employee. Hunt, however, did not believe plaintiff and Williams were a good fit. Plaintiff did not want to supervise Williams because he heard she was difficult to work with and she had filed a discrimination lawsuit against the State of New Jersey.

Plaintiff claims he was told Hunt and Mullen would prepare Williams's performance evaluation, and he would be expected to sign it. Plaintiff believed defendant sought to use him as a Black "shield," given that both he and Williams were Blacks who had sued the State for discrimination. Plaintiff refused to supervise Williams. Walton testified at his deposition that he believed Williams's lawsuit against the State was based on racial discrimination and disability, but in fact, it was only based on disability.

Hunt had an extremely intense outburst during a meeting pertaining to the request that plaintiff should supervise Williams. On April 4, 2013, Hunt sent the following email (the N email) to Mullen and Foraker:

> Patrick and Dana,
>
> FYI, I had tried to avoid a face-to-face encounter with N for the rest of today, to foster a cooling off period. To my dismay, however, as I was returning to my office at 5:45 from a long work discussion with Sue Toth, I encountered N by the 5th floor elevator. We were alone. I said we could talk tomorrow. Then, he

4

point blank, very seriously told me that he "completely disagrees" with the entire assignment that was rolled out today – without mentioning any qualifiers about how additional information might cure the problems. He added that he hopes "no trouble" would result.

He has to go.

Can we discuss? Tom

[(emphasis added).]

Hunt explained he often used initials to refer to individuals. Plaintiff first saw this email during discovery. At his deposition, plaintiff stated he believed the use of the letter N was intended as a racial slur, although he also conceded he sometimes signed his emails using the letter N.

On May 3, 2013, plaintiff emailed Walton and Foraker expressing his belief that they requested he supervise Williams in retaliation for his first lawsuit. On May 14, 2013, plaintiff met with Foraker, Walton, and Mullen to discuss their request that he supervise Williams. Foraker responded that the matter would be referred to DOBI's Office of Equal Employment Opportunities (EEO) for an investigation.

On May 15, 2013, plaintiff's email was forwarded to Linda Boone, who had recently become DOBI's EEO officer. Boone considered herself a friend of plaintiff and therefore recused herself from the investigation. According to

Boone, plaintiff's allegation should have been investigated by the State's EEO office. The record contains no evidence that this occurred.

On June 20, 2013, Hunt acknowledged in an email he had delayed providing plaintiff with a clearly defined assignment and any necessary documents. On June 21, 2013, plaintiff filed the lawsuit that is the subject of this appeal.

On September 3, 2013, plaintiff's superiors again met with him regarding supervising Williams. On September 6, 2013, plaintiff sent an email to Mullen, Foraker, and Walton, alleging they were retaliating for his first lawsuit.

Walton suggested to Hughes that plaintiff should be transferred out of OCF to Legs and Regs, but Hughes rejected Hunt and Mullen's complaints about plaintiff not finishing his assignments. Eventually, both Hughes and Mullen agreed that plaintiff should be reassigned to Legs and Regs.

During the week of October 10, 2014, Hughes, Walton, plaintiff, and Mary Beaumont, director of Legs and Regs, met twice to discuss plaintiff's reassignment. Plaintiff said he did not want to be reassigned to Legs and Regs. On October 14, 2014, Hughes reassigned plaintiff to Legs and Regs. According to Walton, the transfer was purely budgetary, but plaintiff was the only employee transferred at that time.

A-0059-19

Beaumont told Walton she did not want to supervise plaintiff because she believed he had issues completing assignments. Nevertheless, Beaumont became plaintiff's supervisor. Thereafter, Beaumont complained to Hughes about plaintiff's lack of timeliness in completing work.

Denise Illes had recently become chief[2] of Legs and Regs. Although Beaumont was plaintiff's supervisor, Illes also reviewed his work and gave him assignments. Illes stated that in 2014, plaintiff's first discrimination lawsuit was "common knowledge." Illes believed plaintiff did not meet deadlines, and she had concerns about plaintiff's ability to complete his work.

In June 2015, Beaumont retired and Illes became plaintiff's supervisor. At the time, Illes supervised five employees including plaintiff. At least one of the others was Black. Illes complained to Foraker about the timeliness and quality of plaintiff's work.

In 2015, plaintiff filed an EEO complaint after Illes directed two other regulatory officers, one Caucasian and one Black, to review his work. EEO found no discrimination.

---

[2] The record is unclear regarding the difference between "chief" and "director" of Legs and Regs.

A-0059-19

Ila Bhatnagar became DOBI's manager of employee relations in November 2015. She knew about plaintiff's first lawsuit. In January 2016, Illes told Bhatnagar that plaintiff missed deadlines, despite multiple extensions. According to Illes, she and other employees had to complete plaintiff's assignments. Bhatnagar recommended to Walton and Foraker imposing a five-day suspension on plaintiff.

In early 2016, Steven Reed, a clinical psychologist, began to treat plaintiff. On his initial visit with Reed, plaintiff reported difficulty getting out of bed, mental paralysis, and frequent crying. Reed diagnosed plaintiff with major depressive disorder and anxiety disorder. Reed found plaintiff displayed pervasive sadness, lack of motivation, and difficulty concentrating due to a major depressive episode. Plaintiff had insomnia, loss of appetite, fatigue, indecisiveness, inability to relax, low self-confidence, pessimism, and tearfulness.

On February 8, 2016, Walton signed a preliminary notice of disciplinary action (PNDA) charging plaintiff with incompetency, insubordination, conduct unbecoming an employee, neglect of duty, and other sufficient causes, and requested a five-day suspension. Walton acknowledged that progressive discipline, including a written or oral warning or written reprimand, could have

been imposed instead of the suspension. He considered suspension of less than five days minor discipline, but plaintiff's collective bargaining agreement provided that suspension longer than three days was major discipline. Plaintiff appealed the suspension.

On February 16, 2016, plaintiff took a two-month leave of absence. After he returned to work, on July 5, 2016, plaintiff emailed Walton requesting reassignment to DOBI's real estate commission (REC). Robert Kinniebrew managed REC, and had earlier expressed willingness to accept plaintiff as a regulatory officer. Walton discussed the matter with Foraker and Bhatnagar. According to Walton, Kinniebrew concluded he did not want plaintiff to join his staff because he did not think plaintiff was an adequate worker. Plaintiff's request for reassignment to REC was therefore denied.

Plaintiff's disciplinary hearing occurred on July 13, 2016. He was represented by Brian Powers, his union representative. Plaintiff withdrew his appeal after he was told he would be required to testify. Gale Simon, assistant commissioner, served as hearing officer and approved a five-day suspension.

On September 19, 2016, Foraker approved a final notice of major disciplinary action (FNDA) against plaintiff and imposed a five-day suspension

9

that plaintiff served from September 26 to 30, 2016.[3]  After the suspension, Illes told Bhatnagar that plaintiff continued to miss deadlines, and she needed to rework documents he produced.  In October 2016, Foraker became assistant commissioner of DOBI.

Between November 2016 and January 2017, defendant required plaintiff to attend trainings on critical thinking, time management, and problem solving. Plaintiff explained his work quality suffered because he did not have access to LexisNexis for legal research and had difficulty opening certain emails; Bhatnagar acknowledged this was true.

On January 13, 2017, plaintiff emailed Foraker again requesting a transfer to REC because he was being subjected to discrimination and retaliation.  On January 19, 2017, Foraker told plaintiff to send his request to Lisa Joy, manager of HR; Foraker also stated she would relay his allegations of retaliation to Mamta Patel, director of the State's EEO office.  Plaintiff emailed Joy asking about the reassignment to REC.  His request was ultimately denied, and Foraker stated it was because of funding concerns.

---

[3]  Bhatnagar signed on behalf of Foraker.

On February 7, 2017, Illes put plaintiff on a performance improvement plan (PIP).[4] According to Illes, the purpose of the PIP was to provide specific directives and explanations to help plaintiff improve his work. The State's EEO office apparently investigated plaintiff's allegation of discrimination, but the resolution of that matter is not contained in the record. In March 2017, Illes met with plaintiff to discuss the PIP. She stated he was unresponsive, looked angry and aggressive, raised his shoulders, and "breathed out . . . the whole time." She felt intimidated, nervous, and upset about the meeting. According to Illes, the PIP was a disciplinary measure inasmuch as it represented the "next step" after plaintiff was suspended and did not improve his performance.

Plaintiff told Illes he would not follow the PIP because it was discriminatory. At trial, however, he agreed the PIP was generally acceptable and nondiscriminatory.

In March 2017, Bhatnagar suggested filing a second disciplinary charge against plaintiff. On March 22, 2017, Foraker signed another PNDA seeking a thirty-day suspension and charging plaintiff with incompetency,

---

[4] The record contained evidence of two additional PIPs that Illes imposed on plaintiff.

A-0059-19

insubordination, conduct unbecoming an employee, neglect of duty, and other sufficient cause. Thereafter, plaintiff went on medical leave for back surgery.

Powers initially agreed to scheduling of the disciplinary hearing in May 2017, but then sought to adjourn the hearing until plaintiff returned to work. Foraker and Bhatnagar denied Powers's request. Instead, Simon conducted a two-day hearing on May 8 and 24, 2017, and plaintiff participated by phone while on medical leave. Illes was the only witness. Simon imposed a thirty-day suspension on plaintiff.

On June 2, 2017, Foraker signed an FNDA authorizing a thirty-day suspension for plaintiff. However, plaintiff did not serve the suspension because, according to Illes, the department could not spare him for thirty days. Plaintiff's 2017 performance review was very negative. According to Reed, plaintiff made progress in 2017 and started feeling better, but became severely depressed after receiving his bad review.

On October 1, 2018, Bhatnagar became assistant commissioner of DOBI. On April 4, 2019, a few days before trial, Bhatnagar directed her staff to serve disciplinary charges on plaintiff, requesting a forty-five-day suspension. At that point, plaintiff had not submitted work in over a year. Illes did not know why. Plaintiff conceded that because of a total breakdown of his relationship with

12

Illes, his work performance deteriorated between December 2017 and January 2019. He stopped submitting work because he "felt like [he] was in a trap and that [he] was going to get [his] throat cut[.]"

Illes discussed, at trial and in her deposition, a prior incident that occurred when Rita Oghoghome, a Black attorney and regulatory officer Illes had supervised, entered Illes's office while upset and yelled at her while blocking the doorway so Illes could not leave. Illes reported the matter to HR and Oghoghome was disciplined for workplace violence. Illes sought a thirty-day suspension for the incident, but ultimately Oghoghome only served a seven-day suspension. Illes conceded that Oghoghome and plaintiff were the only employees she had ever placed on a PIP, and they were also the only two who accused her of discrimination.

Oghoghome, who was plaintiff's friend, testified she was very upset when she entered Illes's office, and that her voice "carries," but denied threatening her supervisor. Oghoghome believed her PIP was unfounded. According to Oghoghome, when this incident occurred, she was Illes's only Black employee.

In closing arguments at trial, plaintiff's attorney discussed the N email. Plaintiff's counsel rhetorically asked the jury, "[w]hy not refer to him by his name or even his initials?" Plaintiff's counsel conceded "one hundred percent"

13

that "there is nothing in this case about racial slurs, epithets, anything like that." Plaintiff's counsel emphasized that Illes recommended discipline for only two employees in twelve years—both Black.

After plaintiff filed his complaint and amended complaints in this case, alleging discrimination and retaliation under LAD and the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -14, the parties engaged in extensive motion practice, and the trial court granted summary judgment as to plaintiff's CEPA claims. Trial was initially scheduled for August 27, 2018, but was postponed at least five times at defendant's request due to vacations and changing counsel. Approximately thirty days before trial, the trial judge denied a final request for a sixty-day postponement made by recently appointed counsel. The judge denied the request on the theory that defendant had delayed trial by repeatedly obtaining postponements and changing attorneys.

On appeal, defendant raises the following points:

POINT I

THE TRIAL COURT ERRED IN DENYING THE STATE'S MOTION FOR SUMMARY JUDGMENT IN ITS ENTIRETY.

A. Plaintiff's Hostile Work Environment Claims Should Have Been Dismissed at Summary Judgment as a Matter of Law.

14

B.    Plaintiff's LAD Retaliation Claim Should Have Been Dismissed at Summary Judgment as a Matter of Law.

POINT II

THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING THE STATE'S MOTION TO ADJOURN TRIAL.

POINT III

THE TRIAL COURT ABUSED ITS DISCRETION AND COMMITTED HARMFUL ERROR IN PERMITTING THE TESTIMONY OF RITA OGHOGHOME.

POINT IV

THE TRIAL COURT ERRED IN DENYING THE STATE'S RULE 4:37-2(B) MOTION FOR JUDGMENT.

POINT V

THE TRIAL COURT'S DECISION DENYING THE STATE'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT AND/OR NEW TRIAL OR REMITTITUR SHOULD BE REVERSED.

A.    Motion for Judgment Notwithstanding Verdict and New Trial.

B.    Cumulative Errors Below Also Warrant a New Trial.

15

C.    Remittitur Was Appropriate Because The
Damages Award Was Patently Excessive.

I.

Defendant asserts that the court erred in denying its application for involuntary dismissal on the hostile work environment claim at the close of plaintiff's case.  The court reasoned that plaintiff had submitted sufficient evidence to establish the claim.  The court cited Godfrey v. Princeton Theological Seminary, 196 N.J. 178, 197 (2008), which stands for the proposition that an involuntary dismissal should be granted only when no rational juror could conclude that a plaintiff marshalled sufficient evidence to satisfy each prima facie element of a cause of action.  See also Pressler & Verniero, Current N.J. Court Rules, cmt. 2.1 on R. 4:37-2(b) (2022).

The standard for involuntary dismissal is whether the "evidence, together with the legitimate inferences therefrom, could sustain a judgment in plaintiff's favor."  R. 4:37-2(b).  The court's function is mechanical and "not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the party opposing the motion." Dolson v. Anastasia, 55 N.J. 2, 5-6 (1969).  We review the trial court's decision applying the same standard.  Lewis v. Am. Cyanamid Co., 155 N.J. 544, 567 (1998).

A-0059-19

The LAD prohibits an employer from discriminating on the basis of race. N.J.S.A. 10:5-12. Our Supreme Court described the purpose of the LAD as a means of eradicating the "cancer of discrimination." Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587, 600-01 (1993) (quoting Fuchilla v. Layman, 109 N.J. 319, 334 (1988)). We look to federal case law to interpret the LAD. Ibid. Although Lehmann involved a sexual harassment claim, it also applies to hostile work environment claims regarding race. Taylor v. Metzger, 152 N.J. 490, 498-99 (1998).

To establish a claim of hostile work environment under the LAD, a plaintiff must show that the complained-of conduct: "(1) would not have occurred but for the employee's [protected status]; and it was (2) severe or pervasive enough to make a (3) reasonable [person] believe that (4) the conditions of employment [were] altered and the working environment [was] hostile or abusive." Lehmann, 132 N.J. at 603-04.

To establish the first prong, the plaintiff must show that the complained-of conduct would not have occurred "but for" his or her protected status. Id. at 605. Harassing conduct obviously based on the protected status, such as a racial slur, satisfies the first prong. Ibid. However, when the harassment is not obviously based on the victim's protected status, the victim must make a prima

facie showing that the harassment occurred because of his or her protected status. Ibid.

> Common sense dictates that there is no LAD violation if the same conduct would have occurred regardless of the plaintiff's [race]. For example, if a supervisor is equally crude and vulgar to all employees, regardless of their [race], no basis exists for a [racial] harassment claim. Although the supervisor may not be a nice person, he is not abusing a plaintiff because of [his or] her [race].
>
> [Id. at 604.]

In non-facially race-based harassment cases, a plaintiff might show that such harassment was accompanied by harassment that was obviously race-based. Id. at 605. Alternatively, the plaintiff could show that only racial minorities suffered the facially nondiscriminatory harassment. Ibid. The plaintiff must show it is more likely than not that the harassment occurred because of the plaintiff's protected status. Ibid. Upon making such a prima facie case, a rebuttable presumption arises that the facially neutral harassment occurred because of the plaintiff's protected status. Woods-Pirozzi v. Nabisco Foods, 290 N.J. Super. 252, 267 (App. Div. 1996).

Racist remarks by supervisors suggest a hostile work environment. Taylor, 152 N.J. at 502-03. In fact, "[a] single comment, if sufficiently severe, may be enough to create a hostile working environment." El-Sioufi v. St. Peter's

18

Univ. Hosp., 382 N.J. Super. 145, 179 (App. Div. 2005).  However, this is only the case when the comment is "an outrageous and offensive statement made by a supervisor directly to the complaining subordinate."  Ibid.

Plaintiff cites Oghoghome's testimony that Illes only gave PIPs to Black employees.  While that testimony remains unrebutted, it does not establish the first prong of Lehmann because at trial, plaintiff conceded his PIP was reasonable.  Therefore, the PIP does not evince discriminatory harassment.

Plaintiff also contends the N email establishes racial harassment.  See Lehmann, 132 N.J. at 605.  But even assuming "N" was a coded racial slur, the email does not establish a hostile work environment because plaintiff only learned of its existence during discovery.

Finally, plaintiff contends he was used as a Black "shield" against Williams.  Furthermore, he notes Walton believed Williams's lawsuit was race-based, but in fact it was based on Williams's disability.  Plaintiff never supervised Williams and never signed her performance review.  This testimony also does not equate to the type of harassment necessary to establish prong one of Lehmann.

There is no question that plaintiff established prongs two, three, and four.  He was reassigned involuntarily to OCF with unclear job responsibilities; he

19

received no performance reviews for three years; he had to continually ask for work; he received unreasonable deadlines; he was not provided the necessary documents to complete his assignments; defendant refused to adjourn the disciplinary hearing while plaintiff was on medical leave; and some of his complaints about retaliation were not investigated. Nevertheless, because plaintiff did not offer sufficient evidence to establish Lehmann's first prong, he failed to make a prima facie case of hostile work environment. Thus, defendant's motion to dismiss the hostile work environment claim should have been granted.

We similarly conclude that the court erred in denying judgment notwithstanding the verdict (JNOV) on plaintiff's hostile work environment claim. The standard for determining a motion for JNOV under Rule 4:40-2 is the same as that governing a motion for involuntary dismissal under Rule 4:37-2(b) and a motion for judgment under Rule 4:40-1. Pressler & Verniero, cmt. 1 on R. 4:40-2. The court should "accept as true all the evidence which supports the position of the party defending against the motion and must accord that party the benefit of all legitimate inferences which can be deduced therefrom." Ibid. If "reasonable minds could differ," the motion should be denied. Ibid.

> When considering a motion for JNOV or a new trial, "[t]he trial judge shall grant the motion if, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and

convincingly appears that there was a miscarriage of justice under the law." R. 4:49-1(a). The factfinder's determination is "entitled to very considerable respect [and] . . . should not be overthrown except upon the basis of a carefully reasoned and factually supported (and articulated) determination[.]" Baxter v. Fairmont Food Co., 74 N.J. 588, 597 (1977). . . . The purpose of JNOV is "to correct clear error or mistake by the jury," and not for the judge to "substitute his [or her] judgment for that of the jury merely because he [or she] would have reached the opposite conclusion [.]" [Dolson, 55 N.J. at 6-7]. The same standard governs our review of the trial court's determination of a motion for JNOV or a new trial.

[Barber v. ShopRite of Englewood & Assocs., Inc., 406 N.J. Super. 32, 51-52 (App. Div. 2009) (alterations in original).]

Defendant argues that plaintiff's hostile work environment claim was not supported by the evidence because plaintiff never received the N email and there was no other evidence in the record to satisfy prong one of Lehmann. Defendant points out that plaintiff conceded in closing arguments that there were no racial slurs or epithets in this case. Defendant believes the court erred in its reliance on Taylor because that case involved a racial epithet uttered by a supervisor directly to an employee. Here, plaintiff never received the N email.

In light of our conclusions that plaintiff did not establish Lehmann's first prong, JNOV should have been granted. The evidence did not support the jury's conclusion. Failure to grant JNOV was a miscarriage of justice.

A-0059-19

## II.

We affirm the trial judge's decision, however, denying defendant's application for involuntary dismissal and JNOV on the claim of retaliation. N.J.S.A. 10:5-12(d), the LAD's retaliation provision, prohibits retaliation against any person

> because that person has opposed any practices or acts forbidden under this act or because that person has filed a complaint, testified or assisted in any proceeding under this act or to coerce, intimidate, threaten or interfere with any person in the exercise or enjoyment of, or on account of that person having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by this act.

To establish a prima facie case of retaliation, a plaintiff must demonstrate: "(1) that [he or] she engaged in a protected activity; (2) the activity was known to the employer; (3) plaintiff suffered an adverse employment decision; and (4) there existed a causal link between the protected activity and the adverse employment action." Young v. Hobart W. Grp., 385 N.J. Super. 448, 465 (App. Div. 2005) (citing Craig v. Suburban Cablevision, 140 N.J. 623, 629-30 (1995)). "Once [the] plaintiff establishes a prima facie case of retaliation, the defendant must 'articulate a legitimate, non-retaliatory reason for the decision.'" Id. at 465 (quoting Romano v. Brown & Williamson Tobacco Corp., 284 N.J. Super. 543, 549 (App. Div. 1995)). Finally, the plaintiff must demonstrate a discriminatory

A-0059-19

motive and show that the employer's stated reason was merely a pretext for discrimination. Young, 385 N.J. Super. at 465; Romano, 284 N.J. Super. at 549.

Relevant factors include "the employee's loss of status, a clouding of job responsibilities, diminution in authority, disadvantageous transfers or assignments, and toleration of harassment by other employees[,]" as well as "assignment to different or less desirable tasks . . . ." Mancini v. Twp. of Teaneck, 349 N.J. Super. 527, 564 (App. Div. 2002).

Activities furthering an employee's discrimination claim are protected. N.J.S.A. 10:5-12(d). "Jurors may infer a causal connection [between a protected activity and an adverse employment action] based on the surrounding circumstances." Est. of Roach v. TRW, Inc., 164 N.J. 598, 612 (2000) (citing Romano, 284 N.J. Super. at 550)).

Plaintiff's filing of the first discrimination complaint was clearly a protected activity. While that lawsuit was pending, he suffered an adverse employment action: his involuntary reassignment. The decisionmakers who transferred him to OCF knew of his first lawsuit. Thus, a jury could find plaintiff established retaliation.

23

For his first three years in OCF, plaintiff had no job description and did not receive sufficient work. Plaintiff's supervisors actually corroborated these facts.

While plaintiff admitted the 2017 PIP was reasonable, multiple earlier adverse employment actions established retaliation. Additional evidence exists to sustain his retaliation claim. He proved "clouding of job responsibilities" and "disadvantageous transfers or assignments[.]" Mancini, 349 N.J. Super. at 564.

## III.

Defendant also contends the court erred in denying either a new trial or remittitur because of the jury's damages award. The trial court found the jury verdict was supported by the evidence and did not shock the conscience. In fact, the award was similar to the sum in Cuevas v. Wentworth Group, 226 N.J. 480, (2016).

A trial court shall not grant a new trial and reverse a jury verdict unless, "having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law." R. 4:49-1(a).

> A "miscarriage of justice" has been described as a "pervading sense of 'wrongness' needed to justify [an] appellate or trial judge undoing of a jury verdict . . . [which] can arise . . . from manifest lack of inherently

24

credible evidence to support the finding, obvious overlooking or undervaluation of crucial evidence, [or] a clearly unjust result . . . ."

[Risko v. Thompson Muller Auto. Grp., 206 N.J. 506, 521-22 (2011) (alterations in original) (quoting Lindenmuth v. Holden, 296 N.J. Super. 42, 48 (App. Div. 1996)).]

We employ the same standard as the trial court when reviewing the denial of a motion for new trial. R. 2:10-1; Pellicer ex rel. Pellicer v. St. Barnabas Hosp., 200 N.J. 22, 52 (2009). A jury verdict will not be reversed "unless it clearly appears that there was a miscarriage of justice under the law." R. 2:10-1. We defer to the trial court's views on "witness credibility," "demeanor," "feel of the case," and other intangible aspects that are "not transmitted by the written record." Dolson, 55 N.J. at 7. Nevertheless, there is no deference given to the trial court when "it rests upon a determination as to worth, plausibility, consistency or other tangible considerations apparent from the face of the record." Ibid.

Also, a new trial may be limited to the issue of damages, preserving the liability verdict. See Risko, 206 N.J. at 525. A new trial on damages is warranted when it is impossible to separate out from the total jury award the damages attributable to a particular cause of action. See Victor v. State, 401 N.J. Super. 596, 617 (App. Div. 2008).

A-0059-19

As noted, Rule 4:49-1 permits the court to grant a motion for a new trial when there appears to have been a miscarriage of justice. When the miscarriage of justice is solely with respect to damages, however, courts have other options, including remittitur. Fertile v. St. Michael's Med. Ctr., 169 N.J. 481, 490-91 (2001). A court should only grant remittitur in the unusual case where the jury's award is "so patently excessive, so pervaded with wrongness, that it shocks the judicial conscience." Cuevas, 226 N.J. at 485. "The standard is not whether [the] damages award shocks [a] judge's personal conscience, but whether it shocks the judicial conscience." Id. at 486.

There is no "better yardstick" for fixing a monetary amount for emotional distress damages than the jury's impartial judgment and experience. Id. at 507. In Cuevas, the trial court denied remittitur, explaining that the plaintiffs "presented extremely well[,]" were "genuine, earnest, and credible" and the jury found them credible; the Appellate Division affirmed. Id. at 493-94. The Supreme Court observed that calculating emotional distress damages in a discrimination case is not a scientific process and is by definition "inexact." Id. at 500. No two juries will award the same damages, so "a permissible award may fall within a wide spectrum of acceptable outcomes." Ibid. The Court also noted that courts have upheld "assertedly high emotional-distress LAD awards,

even in the absence of expert testimony . . . ." Id. at 508 (favorably citing a case where a plaintiff was awarded $750,000 for emotional distress).

When remittitur is appropriate, it will be "glaring and obvious from the record." Id. at 510. For example, in Besler v. Board of Education of West Windsor, 201 N.J. 544, 555 (2010), an emotional distress award of $100,000 based on a school board not permitting the plaintiff to speak at a public meeting was vacated. Cuevas, 226 N.J. at 509-10. "In the end, a thorough analysis of the case itself; of the witnesses' testimony; of the nature, extent, and duration of the plaintiff's injuries; and of the impact of those injuries on the plaintiff's life will yield the best record on which to decide a remittitur motion." Id. at 510.

Ordinarily, when a portion of a jury verdict is reversed, it would be reasonable to require a new trial on damages. In this case, however, the jury was specifically asked to award emotional distress damages based on the harassment and/or retaliation. The court instructed the jury, "[a]fter considering the evidence, you shall award a lump sum of money that will fairly and reasonably compensate plaintiff for any emotional distress you find he has proven." The jury verdict sheet asked the jury: "What amount of money would fairly and reasonably compensate [p]laintiff . . . for any emotional distress damages proximately caused by the harassment and/or retaliatory conduct?"

27

Thus, the jury was asked to award damages for plaintiff's emotional distress whether it was caused by both causes of action, or either of them. Defendant did not object to the jury instruction or verdict sheet.

Here, plaintiff's psychologist testified extensively about plaintiff's emotional distress, and the treatment that began in early 2016. He described plaintiff as tearful, unmotivated, sad, and having difficulty getting out of bed. Plaintiff suffered from an episode of severe major depressive disorder. The record supported the jury's award, which they were able to make because they were instructed to consider damages for defendant's retaliation. Defendant has not established the basis for a new trial on that ground, nor any basis for remittitur.

IV.

In ruling on a summary judgment motion, a judge must decide whether there is a genuine issue of fact and whether the moving party is entitled to judgment as a matter of law. R. 4:46-2(c). The motion judge must "consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995). The

A-0059-19

appellate court reviews de novo a grant or denial of summary judgment. Town of Kearny v. Brandt, 214 N.J. 76, 91 (2013). Because we have decided that plaintiff did not prove a hostile work environment claim under Lehmann, we do not address defendant's arguments regarding the trial court's denial of summary judgment regarding that cause of action. That issue is moot, "hav[ing] no practical effect on the existing controversy." Greenfield v. N.J. Dep't of Corr., 382 N.J. Super. 254, 258 (App. Div. 2006) (quoting N.Y. Susquehanna & W. Ry. Corp. v. N.J. Dep't of Treasury, Div. of Tax'n, 6 N.J. Tax 575, 582 (Tax 1984), aff'd, 204 N.J. Super. 630 (App. Div. 1985)).

Defendant contends there was no evidence in the summary judgment record establishing a causal link between plaintiff's protected activity and any adverse employment action. The argument lacks support in the record. Prior to plaintiff's first discrimination lawsuit in 2008, he received generally good performance reviews. In 2010, he was involuntarily reassigned to a unit where the manager did not want him, his job responsibilities were unclear, and he received no performance reviews for the next three years. Thus, he clearly presented evidence of the "clouding of job responsibilities" and "disadvantageous transfers or assignments[.]" Mancini, 349 N.J. Super. at 564.

Despite plaintiff's emails in May and September 2013 claiming he was being subjected to retaliation, defendant conducted no investigation.

Plaintiff also suffered an adverse employment action when he was placed on a five-day suspension in 2016. Placed within the context of his transfer, those 2016 disciplinary charges do appear to be retaliatory. That the individual managers involved were not named in the lawsuit does not negate a retaliatory motive. So long as they knew of his first lawsuit, their actions can be considered retaliation. In fact, when the reassignment decisions were made in 2010 and 2014, plaintiff's supervisors were aware of plaintiff's first discrimination lawsuit.

Moreover, jurors may infer a causal connection based on surrounding circumstances. Est. of Roach, 164 N.J. at 612. Here, plaintiff filed a discrimination lawsuit and then began suffering adverse employment actions.

Thus, plaintiff set forth sufficient evidence when viewed in the light most favorable to him. A rational factfinder could conclude he established claims for retaliation.

V.

Nor was the judge's decision to deny the motion to adjourn the trial an abuse of discretion. The judge set forth his reasons extensively, noting that the

30

April 8, 2019 trial date was the fifth one, and that most previous dates were adjourned at the request of defendant. He observed that three attorneys working together for four weeks would have ample time to prepare for trial. Given the scheduling history, he took the view that defendant would keep changing attorneys, delaying the trial indefinitely.

True, plaintiff requested adjournments as well—for example, he asked for an adjournment of the summary judgment motion in the summer of 2018. The significant trial delays, however, were caused solely by defendant. "'[A] functional approach to abuse of discretion examines whether there are good reasons for an appellate court to defer to the particular decision at issue,' which must not be 'arbitrary, capricious, whimsical or manifestly unreasonable[.]'" Mernick v. McCutchen, 442 N.J. Super. 196, 204 (App. Div. 2015) (quoting Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002)). "An abuse of discretion also arises when 'the discretionary act was not premised upon consideration of all relevant factors, was based upon consideration of irrelevant or inappropriate factors, or amounts to a clear error in judgment." Moraes v. Wesler, 439 N.J. Super. 375, 378 (App. Div. 2015) (quoting Masone v. Levine, 382 N.J. Super. 181, 193 (App. Div. 2005)). The judge clearly explained his

A-0059-19

reasons, which were not arbitrary, capricious, whimsical, or manifestly unreasonable. He made a discretionary decision well supported by the record.

Nor did manifest injustice occur because of insufficient time to prepare for trial. Defendant relies on the manifest injustice as to the entire hostile work environment claim. That issue is moot.

## VI.

We do not address the admission of Oghoghome's testimony, which related solely to the hostile work environment claim. This issue is also moot.

Affirmed in part; reversed in part.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION